# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

------------------------------------------------------------------------------------

FAIR HOUSING CENTER OF
METROPOLITAN DETROIT,

        Plaintiff,

v.

CENTURY OPCO GROUP LLC and ST.
CLAIR OPCO LLC d/b/a MEDILODGE OF
ST. CLAIR,

        Defendants.

Case No. 25-11920

**COMPLAINT**

------------------------------------------------------------------------------------

    Plaintiff FAIR HOUSING CENTER OF METROPOLITAN DETROIT ("FHCMD" or "Plaintiff"), by and through its undersigned counsel, EISENBERG & BAUM, LLP submits this Complaint and states as follows:

## PRELIMINARY STATEMENT

    1.    Plaintiff FHCMD is a non-profit organization that is dedicated to ensuring that all people, including those with disabilities, have equal access to housing in the Metropolitan Detroit area.

    2.    Upon information and belief, Defendants own, lease, oversee and/or operate a nursing home facility located in Michigan. Defendants discriminated against both prospective and current deaf residents by refusing to provide

effective auxiliary aids and services for their disabilities, despite requests for effective communication to ensure equal access to Defendants' services.

3.     American Sign Language ("ASL") is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. ASL is best thought of as a foreign language used by American deaf people, with its own grammar and syntax. Deaf individuals are often educated in Deaf schools and grow up in culturally Deaf environments. As a result of both physical and environmental factors, deaf individuals frequently have great difficulty achieving command of spoken or written English. From a pedagogical standpoint, for example, it is difficult to understand how English works if a person has never heard it. However, deaf individuals are often able to communicate effectively, including matters of great complexity, via ASL.

4.     Lip reading is no substitute for ASL. Only 20-30% of spoken English is visible on the lips. Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 WIS. L. REV. 843, 855 (2003). Thus, even someone experienced in reading lips will only see about 30% of what is said and must guess as to the rest. Jamie McAlister, *Deaf and Hard-of-Hearing Criminal Defendants: How You Gonna Get Justice If You Can't Talk to the Judge?*, 26 ARIZ ST. L.J. 163, 172 (1994).

5.     Because of the importance of hearing and sound in learning an oral language like English, it is very difficult for someone who is deaf to learn English, especially if the hearing loss is prelingual. LaVigne & Vernon, *supra*, at 853. As a result, many people who are deaf are functionally illiterate in English and, therefore, are unable to communicate in any meaningful manner via the exchange of written notes.

6.     Having an ASL interpreter available, especially for complicated and important conversations such as those concerning health care, is thus vitally important. Further, it is important to recognize that a qualified interpreter is a skilled individual, not just someone who knows some sign language or who knows how to orally repeat what is being said for an oral deaf individual.

7.     Further, for deaf persons who communicate via ASL, alternative systems or aids will not suffice. Dep't of Justice, Title III Technical Assistance, III-4.3200 Effective Communication (Nov. 1, 1993)("Individuals who use a particular system may not communicate effectively through an interpreter who uses another system. When an interpreter is required, the public accommodation should provide a qualified interpreter . . . ."); Dep't of Justice, Title II Technical Assistance, ADA Best Practices Tool Kit for State and Local Governments – Ch. 3, A. Providing Equally Effective Communication (Feb. 27, 2007) (requiring a

"qualified interpreter" to be provided "[w]hen an interpreter is requested by a person who is deaf or hard of hearing").

8.      FHCMD utilized Fair Housing Testers to determine whether Defendants' nursing home facilities would supply an ASL interpreter for a deaf resident if requested or necessary. The Tester posed as relatives of deaf persons who were interested in becoming a resident at Defendants' facilities.

9.      As shown below, a Tester inquired approximately 12 times between June of 2021 and March of 2024 and was consistently denied an interpreter. Defendant consistently told Tester that Defendant could not provide an ASL interpreter for her mother, including that all interpretation services are provided over the phone so ASL was not an option and that if the family wanted an ASL interpreter they would be responsible for booking and payment.

10.     A senior living facility deprives deaf or severely hard-of-hearing individuals' rights to effective communication and equal housing opportunity when it fails to provide them an ASL interpreter. Thus, Defendants discriminated against prospective deaf or hard-of-hearing residents by failing and/or refusing to provide them qualified ASL interpreters.

11.     Plaintiff brings this lawsuit to compel Defendants to cease unlawful discriminatory practices and to implement policies and procedures that will ensure effective communication, full and equal enjoyment, and a meaningful opportunity

to participate in and benefit from Defendants' residential and health care services. Plaintiff seeks declaratory, injunctive, and equitable relief; compensatory damages; and attorneys' fees and costs to redress Defendants' unlawful discrimination on the basis of disability in violation of the Affordable Care Act and its implementing regulations, the Rehabilitation Act, and the Persons with Disabilities Civil Rights Act.

## PARTIES

12.    Plaintiff FHCMD is a nonprofit organization incorporated in 1977 in the State of Michigan, dedicated to enforcing the fair housing laws and combating housing discrimination in the counties of Wayne, Oakland, and Macomb, Michigan.[1] Its principal place of business is 5555 Conner Street in the City of Detroit, Michigan.

13.    The FHCMD is a membership organization formed to support and encourage equal opportunities in housing in the greater Metropolitan Detroit area without discrimination based upon one's protected status, including one's disability.

14.    In accordance with FHCMD's mission to ensure that fair housing is afforded to all persons within the Metropolitan Detroit area, the FHCMD conducts

---

[1] In January 2024, the FHCMD expanded its service area to include St. Clair County, Michigan.

periodic investigations to identify and document systemic patterns and practices of discrimination as defined in the Fair Housing Act and other statutes pertaining to discrimination and other unlawful denials of equal opportunities.

15.     FHCMD expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted scarce resources away from other FHCMD activities.

16.     Defendants' discriminatory practices frustrated FHCMD's mission to assure equal access to housing in the Metropolitan Detroit area by, among other things, rendering nursing home facilities inaccessible to deaf and severely hearing-impaired individuals.

17.     Defendant St. Clair Opco LLC d/b/a Medilodge of St. Clair is a domestic limited liability company incorporated in Michigan. Upon information and belief, Defendant owns, leases, oversees and/or operates MediLodge located at 4220 S Hospital Drive, East China, MI 48054.

18.     Defendant Century Opco Group LLC owns, operates, and/or oversees Defendant St. Clair Opco LLC d/b/a Medilodge of St. Clair and implemented the discriminatory policy followed by the latter.

19.     Defendants accept federal funding, including Medicare and Medicaid disbursements.

6

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Plaintiff's claims arising under federal law and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for Plaintiff's claims arising under state law.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or Defendants have sufficient contacts with this District to subject them to personal jurisdiction at the time this action is commenced.

## STATEMENT OF FACTS

### Core Business Activities

22.     The FHCMD's core mission, as noted above, is to ensure equal access to housing without discrimination based on all protected class categories, including disability.

23.     To this end, FHCMD's core business activities consist of the intake and investigation of complaints of unlawful housing discrimination, conducting fair housing testing, and negotiating and litigating equal housing disputes.

24.     The FHCMD conducts two types of testing: complaint-based testing that takes place after receipt of a fair housing complaint susceptible to testing to

confirm or dispel the allegation of housing discrimination; and systemic or audit testing to assess the types of housing policies and practices in the real estate market. Testing is used as an investigative tool.

25.     These intake, investigation, testing, and remedial efforts are designed to protect the rights of persons to fair housing opportunities without discrimination on the basis of disability and other protected characteristics.

26.     These efforts and the other activities that comprise the FHCMD's fair housing mission and services, enable the FHCMD to provide housing counseling and referrals, which FHCMD has consistently performed since its incorporation in 1977.

27.     The FHCMD also has a statutory and governmental contractual mission to conduct fair housing testing and to initiate enforcement proceedings to challenge and remediate discriminatory housing practices uncovered through its testing.

28.     Specifically, Congress in the "Private enforcement initiatives" (commonly referred to as the "PEI" component of the FHIP Program, 42 U.S.C. § 3616a(b)), directed that HUD contract "with private fair housing enforcement organizations" to "carry out testing," "discover and remedy discrimination in the .

. . private real estate markets," and fund "the costs and expenses of litigation." 42

U.S.C. § 3616a(b)(1) & (2)(A)-(E).[2]

29.    The FHCMD under the PEI component of the FHIP Program has a

Congressional mandate to initiate enforcement actions, including litigation, based

on its testing. *Id*.; 24 C.F.R. §§ 125.103 & 125.401.[3]

30.    Congress's FHIP Program seeks to eradicate housing discrimination,

which is "a policy Congress considered to be of the highest priority."[4]

31.    FHIP Program guidelines reinforce and regulate the FHCMD's core

statutory mandate. Testing and enforcement protocols are set forth in HUD's FHIP

---

[2]Although the FHIP Program (42 U.S.C. § 3616a) was subsequently codified within the Fair Housing Act, 42 U.S.C. §§ 3601-3619, Congress enacted the FHIP Program in an amendment to the Housing and Community Development Act. Congress established the FHIP Program after noting "the proven efficacy of private nonprofit fair housing enforcement organizations and community-based efforts makes support for these organizations a necessary component of the fair housing enforcement system." Section 905(a)(9) of the Housing and Community Development Act of 1992, Pub. L. 106-550, 106 Stat. 3869 (Oct. 28, 1992).

[3] Private, non-profit fair housing enforcement organizations under Congress's FHIP Program, 42 U.S.C. § 3616a, have essentially the same statutory grant to initiate enforcement proceedings as does HUD, 42 U.S.C. § 3610, the Attorney General, 42 U.S.C. § 3614, and state and local agencies. 42 U.S.C. § 3610(f).

[4]*Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 211 (1972); see also *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc*., 576 U.S. 519, 524 (2015) (Fair Housing Act's central purpose is to "eradicate discriminatory practices".); *Meyer v. Holley*, 537 U.S. 280, 290 (2003) ("overriding societal priority"); 42 U.S.C. § 3601 ("policy of the United States to provide . . . for fair housing throughout the United States"). Congress implements this policy and mission through the FHIP Program by authorizing "testing" to "discover and remedy discrimination". *See also Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 198 (2017)("[W]e have held that the [Fair Housing] Act allows suits by . . . a nonprofit organization that spent money to combat housing discrimination.").

Application and Award Policies and Procedures Guide (Sept. 2017) ("AAPP") (

https://www.hud.gov/sites/dfiles/FHEO/documents/APP%20Guide%205.17.17m

pn.pdf). The AAPP, like 42 U.S.C. § 3616a, mandates that FHIP grant recipients

in enforcement actions based on testing request "damages" and "appropriate

remedies"; "seek reimbursement for diversion of resources in legal actions

resulting from its investigations" and "legal expenses"; and seek "reimbursement

of revolving funds where funds have supported successful litigation." AAPP, at

195-196.

32.     Under OMB regulations and HUD grant requirements, the proceeds

of enforcement actions constitute "program income" reported to and administered

by HUD as an agency of the Federal Government. 2 C.F.R. § 200.307; AAPP, at

86 & 114-115. Failure to perform these required grant activities, including

initiating enforcement proceedings and reporting program income, subjects FHIP

grant recipients to sanctions, including grant termination and debarment. 2 C.F.R.

§§ 200.339 & 200.344(i).

33.     Such program income can offset Congress' FHIP funding. 2 C.F.R.

§§ 200.304, 200.307 & 200.407(c). As such, organizational enforcement not only

redresses the direct financial injury to FHIP grant recipients but also reimburses

HUD and the Federal Government for FHIP PEI enforcement expenditures.

34. Therefore, pursuing enforcement upon discovering discrimination is not merely a core business activity but also a required component of FHCMD's grant obligations and fiscal responsibilities under the FHIP Program.

### Overview of the FHCMD's ASL Testing

35. Congress's FHIP Program directs HUD to contract "with private nonprofit fair housing enforcement organizations" to "carry out special projects, including the development of prototypes to respond to new or sophisticated forms of discrimination against persons protected under [the Fair Housing Act]". 42 U.S.C. § 3616a(b)(2)(C).

36. Beginning in approximately March to May of 2019, the FHCMD learned of violations of ASL requirements in other parts of the U.S., as a new or sophisticated form of discrimination against deaf persons who communicate via ASL. AAPP, at 92 (strategies for identifying systemic or "audit-based" testing).

37. This was a concern to the FHCMD as there could be unreported or undetected violations of ASL requirements in nursing home facilities in the FHCMD's service area against deaf or hard-of-hearing persons who communicate via ASL, necessitating a systemic testing investigation.

38. The FHCMD thereafter conducted a systemic or "audit-based" testing investigation as to ASL requirements in nursing home facilities as part of the

FHCMD's FHIP PEI grant. AAPP, at 92 (referring to systemic, non-complaint-based testing as "audit-based" testing).

39.     All of the FHCMD's systemic testing as to the Defendants' compliance with ASL requirements took place pursuant to the FHCMD's FHIP PEI grant.

40.     FHCMD's testing investigation against the Defendants involved the Testers making telephone calls to Defendants and visiting Defendants' facilities. The Testers were given assignments as "proxy" testers to make inquiries on behalf of a deaf relative.[5] The Testers gathered preliminary information about Defendants' services and inquired specifically about the availability of auxiliary aids and services, including onsite ASL interpreters, for their deaf relative.

41.     Each Tester took detailed notes memorializing the date and time of the test, who they spoke to, and what was discussed.

## Defendants' Repeated Failures to Provide ASL Services as a Reasonable Accommodation

42.     Tester called on June 15, 2021 and June 17, 2021 to speak with Jessica, who worked in Defendant's admissions office, but did not receive an answer. On June 21, 2021, Jessica returned Tester's call and indicated that beds

---

[5] HUD Office of Policy Development and Research, *Discrimination Against Persons with Disabilities: Testing Guidance for Practitioners*, at 15, 17, 22, 24, & 33 (July 2005)(discussing proxy testing as appropriate testing methodology) (available at https://www.hud.gov/sites/documents/dss-guidebook.pdf).

were available. Tester asked about an ASL interpreter for her mother, and Jessica stated she would have to speak with the coordinator. Tester had not received a call back, so she scheduled an in-person tour.

43.     On June 24, 2025, Tester visited the facility. Upon arrival, Tester reminded Jessica that Tester was waiting for a call back. Jessica looked confused and stated she forgot to inquire about an interpreter, though she offered to make calls to find out. On June 25, 2025, Tester received a voicemail from Jessica stating that Defendant could not provide an interpreter but Jessica was sorry and wished her luck.

44.     Simultaneously on June 24, 2021, a Tester called Defendant and explained that his deaf mother never learned to read or write, so he needed to know if Defendant had an ASL interpreter on staff. Jessica stated that there was no interpreter on staff, but she would inquire. She mentioned this was the second time this week she had run into a circumstance requiring an ASL interpreter. Tester specifically asked if Defendant could provide an interpreter for medical assessments, and Jessica reiterated that she would look into it.

45.     On June 25, 2021, Jessica emailed the second Tester as well to tell him Defendant could not provide an interpreter.

46.     Again on April 4, 2023, a Tester called to inquire about a bed for her mother-in-law. Defendant's staff stated there were no beds available at that time.

Tester explained that her mother-in-law was deaf and could not read, write, or read lips, and would need an interpreter for medical assessments. Defendant's employee, Charity, replied, "I do believe we would have to but it would be a challenge." Charity took Tester's information and said she would call back. The records indicate that Charity did not return the call.

47.    Finally, another Tester inquired approximately eight times between February 27, 2024 and March 4, 2024. On two occasions on February 27, 2024, Tester called twice and did not receive an answer from admissions, so she left one voicemail.

48.    On February 28, 2024, Tester called Defendant again to inquire about a bed for her uncle. Charity answered the phone again and asked if Tester's uncle received Medicare. When Tester asked about the ASL interpreter, Charity said she had never been asked that question and she would need to find out. The two agreed that Tester would call Charity back that afternoon. When Tester called, Charity did not answer and Tester left a voicemail.

49.    On February 29, 2024, Tester called again. Charity explained that she did not yet have an answer. Charity stated that she was sure Defendant provided an interpreter for medical assessments but she needed to know the process of obtaining one. Tester and Charity agreed to speak again later in the day once Charity had a chance to look into the details of the interpretation protocol. When

Tester called Defendant back twice that day nobody answered; Tester did not leave a message.

50.    On March 1, 2024, Tester called two or three times and could not connect with Charity, so she left at least two messages. She did not receive a call in return.

51.    Tester called two final times on March 4, 2024, getting the voicemail the first time and speaking with Charity the second time. When Charity answered the phone, Tester asked if Charity learned the process for obtaining an interpreter and who would pay for the service. Charity responded, "I think it would probably be an additional charge because we would have to go through the country to get an interpreter. So typically, I think they bill it to the family directly." Tester thanked Charity for her time and hung up. Defendant never contacted Tester again.

52.    In short, all tests resulted in either a blunt denial or the failure to provide a direct, affirmative answer showing that Defendants would provide an ASL interpreter for deaf individual as necessary to assure a deaf person the full and equal access to Defendants' facilities.

## Injuries to Plaintiff

53.    Defendants' discriminatory policy of refusing to provide ASL interpreters directly interfered with FHCMD's core mission and business activities. This interference frustrated FHCMD's mission, inflicted informational

injury, and compelled FHCMD to divert its limited resources. Upon discovering this policy through initial testing, FHCMD was forced to expend additional resources in conducting follow up testing to confirm the policy and its scope—activities necessary to fulfill the FHCMD's core mission and statutory mandate and to remediate the denial of equal housing access.

54.    Defendants' actions concerning the Tester demonstrate this interference.

55.    When asked if there were any interpreters available, one of Defendants' staff members outright denied ASL interpretation services and the other stated that if Testers' family members wanted an interpreter, they would need to pay for it out of the families' pockets.

56.    Despite receiving federal funding to provide health services to residents in exchange for the promise to not discriminate on the basis of disability (among other demographics), Defendants' employee, Charity, stated that Defendants could not provide an interpreter but if Tester's family member wanted one, the service provider could "bill it to the family directly."

57.    Defendants' refusal directly frustrated FHCMD's mission and constituted informational injury by misrepresenting and providing false information concerning the availability of ASL services that should be provided by Defendants for persons who are deaf or hard-of-hearing and communicate via

ASL. Never once did Defendants communicate in a direct, affirmative fashion that ASL services could be provided as a reasonable accommodation to persons who are deaf. This necessitates that the Center divert and allocate scarce resources to address Defendants' misrepresentations.

58.    Defendants' discriminatory policy and practices directly interfered with and frustrated FHCMD's core organizational mission to facilitate open housing and eradicate discrimination against people with disabilities. They actively undermined FHCMD's ability to provide effective housing counseling and referrals for the deaf and hard-of-hearing community and obstructed its organizational mission and its statutory and contractual mandate under the FHIP Program to eradicate discrimination.

59.    The FHCMD was not merely inconvenienced by Defendants' unlawful conduct. Rather, Defendants' actions directly caused FHCMD a concrete injury by forcing it to divert significant staff time and financial resources away from other vital fair housing activities, such as other systemic investigations, proactive community outreach, or scheduled counselor training. Once Defendants' refusal to provide ASL interpreters became apparent in the first fair housing test, FHCMD was compelled to incur these costs and expenses to conduct necessary follow-up testing to confirm the scope and nature of Defendants' policy and to undertake efforts to disseminate accurate information to counteract Defendants'

misrepresentations through advertisements, FHCMD's website, and social media posts.

60.     More specifically, prior to the filing of this pleadings, FHCMD diverted its scarce time, money, and resources from its typical activities—which includes a range of training and education; working with neighborhood groups, community organizations and other service providers; providing consulting and program implementation services; and referral services—in order to investigate and counteract Defendants' disability discrimination.

61.     The FHCMD also diverted considerable resources and staff time to conduct the testing, which included, preparing and planning multiple trainings for its staff and testers; conducting numerous internal and external meetings; researching and planning the testing; identifying the nature and scope of the testing; drafting and designing testing materials; documenting the testing progress and results; travel time and expenses; and significant staff hours diverted from other work to conduct these testing activities.

62.     In addition, FHCMD has engaged in various community outreach and public education campaigns to counteract and to raise awareness of the discriminatory practices among senior living facilities. For example, it developed and published materials to educate the public concerning the rights of deaf and hard-of-hearing individuals with respect to reasonable accommodations and

reasonable modifications, such as ASL interpreters, in nursing home facilities and nursing homes, and included discission of ASL requirements in fair housing trainings and presentations.

63.    These activities and expenditures were not voluntary or otherwise incurred merely for the purpose of establishing standing. The FHCMD is not a generic, policy advocacy type organization that seeks to challenge governmental policies that are more properly addressed through the political and democratic processes. Rather, the FHCMD was acting pursuant to its specific role implementing Congress' FHIP Program, which requires FHCMD to "carry out testing", "discover and remedy discrimination" discovered through testing, and to initiate "such enforcement activities as appropriate to remedy such violations". 42 U.S.C. § 3616a(b)(1) & (2)(A)-(B). FHCMD's responsive actions were precisely those mandated by Congress upon uncovering discrimination.

64.    A favorable decision granting damages and injunctive relief will directly redress FHCMD's injuries. It will allow FHCMD to recover the resources diverted due to Defendants' unlawful actions, enjoin Defendants' discriminatory practices to ensure equal access for individuals requiring ASL interpreters, and directly advance Congress's expressed goal of eradicating disability discrimination.

## COUNT I: FAIR HOUSING ACT – DISABILITY DISCRIMINATION

65.     Plaintiff realleges all preceding paragraphs in support of this claim.

66.     Defendants owns and/or lease dwellings within the meaning of 42 U.S.C. § 3602(b), which includes "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

67.     Plaintiff is an aggrieved person within the meaning of 42 U.S.C. § 3602(i), has been injured by the Defendants' discriminatory conduct, and has suffered damages, including the diversion of resources and frustration of mission.

68.     The Fair Housing Act provides that it is illegal "to discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling or in the provision of services or facilities in connection with such dwelling, because of a handicap of … a person residing in or intending to reside in that dwelling." 42 U.S.C. § 3602(f).

69.     "Discrimination" under this section, includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3602(f)(3)(B).

70.     Under the Fair Housing Act, it is unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statements, or advertisement,

with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on … handicap … or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c).

71. Plaintiff's Testers requested and were denied the reasonable accommodation of having a qualified ASL interpreter for their fictitious family member, which would allow access and an opportunity to participate, use and enjoy services provided by Defendants' facilities that are connected to their dwellings and which equally situated hearing residents are able to enjoy.

72. Defendants discriminated on the basis of disability, in violation of the above-cited provisions of the Fair Housing Act.

73. Defendants violated the Fair Housing Act by, inter alia, denying Plaintiff's Testers' requests for the provision of a qualified sign-language interpreter and thereby denying their fictitious deaf or severely hard-of-hearing family members, on whose behalf the Testers were inquiring, access to services, programs or activities provided by Defendants in connection to their facilities. Defendants violated the Fair Housing Act by, inter alia, adopting, stating, and advertising their policy or practice of refusing to provide qualified sign-language interpreters to any person requesting such accommodations in order to reside at Defendants' facility.

74.     Upon information and belief, Defendants' refusal to offer ASL interpreter services is a result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the right of a deaf individual to have an equal opportunity to benefit from Defendant's services.

75.     Regardless of whether the statements made by Defendants were intended to indicate any preference, limitation, or discrimination based on disability, an ordinary listener would understand their statements to indicate a limitation, preference, or discrimination because of the disability of the proposed occupants. These statements were made in the course of advertising and marketing the Defendants' dwelling units to potential applicants. They had the effect of infringing on the rights of people with disabilities.

76.     Accordingly, Plaintiff is entitled to actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c).

## COUNT II: AFFORDABLE CARE ACT – DISABILITY DISCRIMINATION

77.     Plaintiff realleges all preceding paragraphs in support of this claim.

78.     At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act and its implementing regulations have been in full force and effect and has applied to Defendants' conduct.

79.    The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to "any person aggrieved" by discrimination in violation thereof. 42 U.S.C. § 18116(a).

80.    At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

81.    Under Section 1557 of the Patient Protection and Affordable Care Act, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

82.    Pursuant to 45 C.F.R. § 92.202, "[a] covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in health programs and activities, in accordance with the standards found at 28 C.F.R. 35.160 through 35.164. Where the regulatory provisions reference in this section use the term 'public entity,' the term 'covered entity' shall apply in its place." 45 C.F.R. § 92.202.

83.    Pursuant to 45 C.F.R. § 92.205, "[a] covered entity shall make reasonable modifications to policies, practice, or procedures when such modifications are necessary to avoid discrimination on the basis of disability … the term reasonable modifications shall be interpreter … as set forth in the ADA Title II regulation." 45 C.F.R. § 92.205.

84.    Pursuant to 45 C.F.R. § 92.209, "[a] covered entity shall not exclude from participation in, deny the benefits of, or otherwise discriminate against an individual or entity in its health programs or activities on the basis of the race, color, national origin, sex, age, or disability of an individual with whom the individual or entity is known or believed to have a relationship or association." 45 C.F.R. § 92.209.

85.    As set forth above, Defendants discriminated against deaf individuals, on the basis of disability, in violation of the ACA and its implementing regulations. Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission and injury to its core business activities.

86.    Plaintiff's Tester requested and were denied the reasonable accommodation of having a qualified ASL interpreter for their family member, which would allow access and an opportunity to participate, use and enjoy services

provided by Defendants' facilities and which equally situated hearing residents are able to enjoy.

87.    Defendants violated the Affordable Care Act by, inter alia, denying Plaintiff's Tester's requests for the provision of a qualified sign-language interpreter and thereby denying their deaf or severely hard-of-hearing family members, on whose behalf the Tester was inquiring, access to services, programs or activities provided by Defendants in connection to their facilities.

88.    Upon information and belief, Defendants' refusal to offer ASL interpreter services is a result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the right of a deaf individual to have an equal opportunity to benefit from Defendants' services.

89.    Plaintiff is therefore entitled to injunctive relief, as well as compensatory damages for the injuries and loss it sustained as a result of Defendants' discriminatory conduct and deliberate indifference as previously alleged, pursuant to 42 U.S.C. § 18116(a).

## CLAIM III: REHABILITATION ACT

90.    Plaintiff realleges all preceding paragraphs in support of this claim.

91.    Plaintiff is an organization whose mission is to ensure that all people––including those with disabilities—have equal access to housing that has diverted its resources to address Defendants' failure to provide services to such individuals.

92.     At all times relevant to this action, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 has been in full force and effect and has applied to Defendants' conduct.

93.     At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to Defendants' conduct.

94.     At all times relevant to this action, Defendants were recipients of federal financial assistance within the meaning of the Rehabilitation Act.

95.     Defendants' personal care and/or health care services are a "program or activity" within the meaning of the Rehabilitation Act.

96.     Pursuant to Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

97.     Defendants' actions constitute discrimination, solely on the basis of disability, by denying meaningful access to the services, programs, and benefits that Defendants offer to other individuals, and by refusing to provide auxiliary aids

and services necessary to ensure effective communication, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

98. Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, programs or activities receiving Federal financial assistance "must afford handicapped person equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4(b)(2).

99. Pursuant to Federal regulations implementing Section 504 of the Rehabilitation Act, healthcare providers "shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question…. For the purpose of this paragraph, auxiliary aids may include brailled and taped material, interpreters, and other aids for persons with impaired hearing or vision." 45 C.F.R. § 84.52(d).

100. Upon information and belief, Defendants' refusal to offer ASL interpreter services is the result of a policy or practice of Defendants, and Defendants are deliberately indifferent to the rights of a deaf individual to have an equal opportunity to benefit from Defendants' services.

101. The Rehabilitation Act extends standing and relief to "any person aggrieved" by discrimination in violation thereof. 29 U.S.C. § 794a(a)(2). Plaintiff

is an aggrieved person as defined by Section 794a(a)(2) of the Rehabilitation Act. As a result of Defendants' actions alleged above, Plaintiff has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

102.    Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct and deliberate indifference, including the diversion of its resources and frustration of its mission, as alleged, pursuant to 29 U.S.C. § 794(a).

103.    As set out above, absent injunction relief there is a clear risk that Defendants' actions will continue to occur and continue to frustrate Plaintiff's mission. Therefore, Plaintiff is entitled to injunctive relief.

104.    Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) and/or common law.

## COUNT IV: MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT – DISABILITY DISCRIMINATION

105.    Plaintiff realleges all preceding paragraphs in support of this claim.

106.    Defendants own and/or lease dwellings within the meaning of M.C.L. § 37.1501.

107.    Pursuant to M.C.L. § 37.1506a, it is unlawful to "[r]efuse to make reasonable accommodations in rules, policies, practices, or services, when the

accommodations may be necessary to afford the person with a disability equal opportunity to use and enjoy residential real property."

108.   Pursuant to M.C.L. § 37.1502(1)(f), it is unlawful on grounds of disability to "[m]ake, print, circulate, post, mail, or otherwise cause to be made or published a statement, advertisement, notice, or sign . . . in connection with a prospective real estate transaction, which indicates, directly or indirectly, an intent to make a preference, limitation, specification, or discrimination with respect to the real estate transaction."

109.   Plaintiff's Testers, on behalf of their deaf and severely-hard- of-hearing family members, requested and were denied the reasonable accommodation of having a qualified ASL interpreter, and thus were denied access and an opportunity to use and enjoy Defendants' residential property.

110.   Regardless of whether the statements made by Defendants' employees were intended to indicate any preference, limitation, or discrimination based on disability, an ordinary listener would understand their statements to indicate a limitation, preference, or discrimination because of the disability of the proposed occupants. These statements were made in the course of advertising and marketing the Defendants' dwelling units to potential applicants. They had the effect of infringing on the rights of people with disabilities.

111.   Defendants discriminated on the basis of disability, in violation of the above-cited provisions of the PWDCRA.

112.   Plaintiff is an aggrieved person within the meaning of M.C.L. § 37.1501 et seq., has been injured as a result of Defendants' discriminatory conduct, and has suffered damages, including diversion of resources and frustration of mission.

113.   Plaintiff is entitled to actual damages, injunctive relief, and reasonable attorney fees and costs pursuant to M.C.L. § 37.1606.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully prays that this Court grant the following relief:

A.    Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' policies, procedures, and practices have discriminated in violation of the Fair Housing Act, Section 504 of the Rehabilitation Act, the ACA, and the PWDCRA;

B.    Enjoin Defendants from implementing or enforcing any policy, procedure, or practice that denies deaf or hard of hearing individuals meaningful access to and equal enjoyment of Defendants' facilities, services or programs;

C.    Order Defendants to:

i.    develop, implement, promulgate, and comply with a policy prohibiting future discrimination against deaf or hard of hearing individuals by failing to provide effective communication;

ii.    develop, implement, promulgate, and comply with a policy requiring that when a deaf or hard of hearing individual requests an onsite interpreter for effective communication, one will be provided as soon as practicable in all services offered by Defendants;

iii.    develop, implement, promulgate, and comply with a policy to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that Defendants will provide sign language interpreters, videophones, and other communication services to ensure effective communication with deaf or hard of hearing persons;

iv.    develop, implement, promulgate, and comply with a policy to ensure that deaf or hard of hearing individuals are able to communicate through the most appropriate method under the circumstances;

v.     create and maintain a list of American Sign Language interpreters and ensure availability of such interpreters at any time of day or night;

vi.    train all their employees, staff, and other agents on a regular basis about the rights of individuals who are deaf or hard of hearing under the Fair Housing Act, Section 504 of the Rehabilitation Act, ACA, and PWDCRA;

vii.   train all their employees, staff, and other agents on a regular basis about Defendants' policy regarding how to obtain interpreters when reasonably requested by deaf or hard of hearing individuals; and

viii.  implement a program of testing Defendants' employees, staff, and other agents to determine whether they are complying with the requirements of the Fair Housing Act, Section 504 of the Rehabilitation Act, ACA, and PWDCRA.

D. Award to Plaintiff:

i.   Compensatory damages pursuant to the FHA, Rehabilitation Act, ACA, and PWDCRA;

ii.  Punitive damages pursuant to the FHA;

iii. Nominal damages pursuant to the FHA, Rehabilitation Act, ACA, and PWDCRA;

iv. Reasonable costs and attorneys' fees pursuant to the FHA, Rehabilitation Act, ACA, and PWDCRA; and

v. Any and all other relief that this Court finds necessary and appropriate.

Respectfully Submitted,

/s/ Andrew Rozynski
By: Andrew Rozynski NY#505446
Eisenberg and Baum, LLP
24 Union Square East, Penthouse
New York, NY 10003
Telephone No. 212-353-8700
Fax No. 917-591-2875
arozynski@EandBLaw.com

Dated: June 25, 2025